**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. _____**

HIGH PLAINS HARVEST CHURCH; and
MARK HOTALING,

      Plaintiffs,

v.

JARED POLIS, in his official capacity as Governor of the State of Colorado; and
JILL HUNSAKER RYAN, in her official capacity as Executive Director of the Colorado
Department of Public Health and Environment,

      Defendants.

_____

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

**AND**

**MOTION FOR PRELIMINARY INJUNCTION**
_____

Plaintiffs submit the following Motion for Temporary Restraining Order and Motion for

Preliminary Injunction.

## I. INTRODUCTION

Today in Colorado it is perfectly legal for hundreds of shoppers to pack themselves

cheek by jowl into a Lowes.  But if 50 people meet to worship God in a small rural church, they

do so at the risk of being fined and imprisoned.  Plaintiffs feel as though they have stepped

through the looking glass into a world where the right to shop for gardening supplies and home

improvement materials is protected by the Constitution, while meeting as a body to worship

1

God corporately has been relegated to the category of unnecessary of even superfluous. Plaintiffs call upon the Court to come to their aid, vindicate their religious liberties under the First Amendment to the United States Constitution, and remedy the surreal state of affairs in which they inexplicably find themselves.  Plaintiffs seek a temporary restraining order and a preliminary injunction preventing the State of Colorado (the "State") from imposing criminal penalties (including fines and jail time) for engaging in corporate worship in the Church's sanctuary.

## II. FACTS

High Plains Harvest Church ("HPHC" or the "Church") is a small church in Ault, Colorado.  V.Compl. ¶ 2.  HPHC's vision is to be a Christ-centered, rural, regional church that makes a genuine difference in the hearts of people throughout northern Colorado. V.Compl. ¶11.  The Church seeks to create an environment where each person is: cultivating daily, life-changing intimacy with the Savior; experiencing biblical community with others in the body of Christ; using their time, talents, and treasures to further God's kingdom; engaging in intentional discipleship and ministry; and bringing the Gospel into their sphere of influence with word and action.  *Id*.

Hotaling is a former Navy SEAL and a service-disabled veteran.  V.Compl. ¶ 12.  After returning home from the Navy, Hotaling followed the Lord's call to serve Him full-time.  *Id*. Hotaling is a devout Christian and a pastor in the Church.  *Id*.  Until the recent COVID-19 outbreak, Hotaling frequently attended and/or led services as the Church.  *Id*.  He typically attended and/or led three to four services and/or other religious gatherings per week.  *Id*.

Hotaling has a sincerely held religious belief that in-person attendance at church is central to his faith.  *Id.*

In response to the presence of COVID-19 in Colorado, on April 26, 2020, Governor Polis issued his so-called "Safer at Home" order, Executive Order, D 2020 044 (the "Executive Order").  V.Compl. ¶ 13.  A copy of the Executive Order is attached as Exhibit A to the Verified Complaint.  *Id.*

In the Executive Order Governor Polis directed Director Ryan to issue a public health order prohibiting public gatherings of ten (10) persons or more (hereinafter "Mass Gatherings") in both public spaces and private commercial venues.  V.Compl. ¶ 14; Executive Order II.H.3.

On May 14, 2020 Director Ryan issued Third Amended Public Health Order 20-28 Safer at Home (the "PHO").  V.Compl. ¶ 15.  The PHO "sets forth the requirements for implementation of [the Executive Order], as directed by Governor Polis."  *Id.*  A copy of the PHO is attached as Exhibit B to the Verified Complaint.  *Id.*

The PHO prohibits all public and private gatherings greater than ten individuals except for "Necessary Activities."  PHO I. C.  V.Compl. ¶ 16.  There is no numerical limit on the number of persons who may be present when "Necessary Activities" are conducted.  *Id.*  Religious worship services are not considered Necessary Activities under the PHO.  *Id.*

"Necessary Activities" do include activities associated with "Critical Businesses." V.Compl. ¶ 17; PHO III. A. 4.  "Critical Businesses" are listed in Appendix F to the PHO and include numerous business activities, including grocery stores; produce stands; gas stations; convenience stores; marijuana dispensaries; liquor stores; gun stores; funeral homes, airlines,

mining operations such as oil and gas extraction, hardware stores; laundromats; banks; law offices; and accounting offices.  V.Compl. ¶ 17.

The PHO states that it "will be enforced by all appropriate legal means," and that "[f]ailure to comply with this order could result in penalties, including jail time, and fines . . ." V.Compl. ¶ 18; PHO, VI.  A previous version of the PHO invoked the authority of C.R.S. § 25-1-114 to impose criminal penalties.  *Id.*

Director Ryan has also issued "Guidance for Places of Worship" to implement the Executive Order (the "Guidance").  V.Compl. ¶ 19.  A copy of the Guidance is attached as Exhibit C to the Verified Complaint.  *Id.*  The Guidance states that religious gatherings are permitted only as long as the gatherings are with 10 people or fewer.  *Id.*; Guidance, p. 1.  The Executive Order, the PHO and the Guidance shall be referred to herein collectively as the "Orders."

On May 25, 2020, Hotaling went to a local Lowes.  He observed literally hundreds of customers going in and out of the store.  The parking lot was packed to near capacity, and drivers were circling in hopes of finding a parking spot. V.Compl. ¶ 21; Exhibit D to V.Compl.

The Orders have the effect of prohibiting a gathering of 50 worshipers in HPHC's sanctuary – even if all of those worshipers observe social distancing requirements – while at the very same time allowing hundreds of people in the Lowes down the road.  V.Compl. ¶ 22.

The Bible commands Christians not to forsake the gathering together of believers. Hebrews 10:24-25.  V.Compl. ¶ 23.  In-person corporate worship is a fundamental tenet of Christian practice and has been for nearly 2,000 years.  *Id.*  HPHC and its members, including

Hotaling, have a sincerely held religious belief that the physical corporate gathering of believers is a central element of religious worship commanded by the Lord.  V.Compl. ¶ 24. It is a substantial burden on the religious exercise of HPHC and its members, including Hotaling, if they cannot meet for in-person corporate worship as a body of believers.  V.Compl. ¶ 25. HPHC in furtherance of the sincerely held religious beliefs of its members, desires to recommence in-person worship services.  V.Compl. ¶ 26.

In all services, HPHC and Hotaling will following CDC guidelines for faith communities.  *See Centers for Disease Control and Prevention Interim Guidance for Communities of Faith*, https://www.cdc.gov/coronavirus/2019-ncov/php/faith-based.html?mod=article_inline.  V.Compl. ¶ 27.  These guidelines include:

- Encouraging staff and congregants to maintain good hand hygiene

- Encouraging use of cloth face coverings among staff and congregants

- Cleaning and disinfecting frequently touched surfaces at least daily and shared objects in between uses

- Promoting social distancing at services and other gatherings, ensuring that clergy, staff, choir, volunteers and attendees at the services follow social distancing throughout services

*Id.*

Hotaling and HPHC also intend to follow the social distancing standards set forth in Director Ryan's Guidance.  V.Compl. ¶ 28.  Hotaling expects approximately 50 people to

5

attend the in-person services.  V.Compl. ¶ 29.  To the best of Hotaling's knowledge, no member

of HPHC has COVID-19.  V.Compl. ¶ 30.

The Church and Hotaling reasonably fear prosecution, including fines, arrest, and jail, if

they proceed with this plan to meet for in-person corporate worship in a group of more than ten

worshipers.  V.Compl. ¶ 31.  Governor Polis and Director Ryan have actively enforced the

Orders and declared their intention to continue to do so.  V.Compl. ¶ 32.

### III.  ARGUMENT

**A.**     **Standard for Granting Temporary Restraining Order and Preliminary Injunction**

**1.**     **TRO**

The court may issue a temporary restraining order without written or oral notice to the

adverse party or its attorney if:

> (A) specific facts in [] a verified complaint clearly show that immediate and
> irreparable injury, loss, or damage will result to the movant before the adverse
> party can be heard in opposition; and
>
> (B) the movant's attorney certifies in writing any efforts made to give notice and
> the reasons why it should not be required.

A party seeking a TRO must show (1) a likelihood of success on the merits; (2) a

likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3)

that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public

interest.  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir.2009).  A showing of

probable irreparable harm is the single most important prerequisite for the issuance of a TRO;

therefore, the moving party must first demonstrate that such injury is likely before the other

requirements will be considered.  *A.K. by & through Moyer v. Cherry Creek Sch. Dist. No. 5*,

2020 WL 2197920, at *2 (D. Colo. 2020), *quoting, First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017).

In this case all of the elements for issuance of a TRO are present.  As to irreparable harm, as discussed in detail below, Plaintiffs will suffer irreparable harm to their First Amendment rights if the Orders challenged in this action are enforced.  The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir.2003) (citation omitted).  The third and fourth factors identified in *Roda Drilling*, *supra*, also weigh in favor of Plaintiffs.  When a law is likely unconstitutional, the government's interest in enforcing the law does not outweigh that of individuals in securing the protection of their constitutional rights. *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012).  Finally, "it is always in the public interest to prevent the violation of a party's constitutional rights."  *Id*. at 1132.

Plaintiffs have attached a form of TRO based on the TRO issued by the United States District Court for the Western District of Kentucky in *On Fire Christian Ctr., Inc. v. Fischer*, 2020 WL 1820249 (W.D. Ky. 2020).

## 2.        Preliminary Injunction

To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest.  *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007).

It is well-settled that a showing of the infringement of a constitutional right is enough and requires no further showing of irreparable injury. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 805 (10th Cir. 2019). In the context of constitutional claims, this principle collapses the first and second preliminary-injunction factors. *Id.*, at 806. The third and fourth factors also merge when the government is the opposing party. *Aposhian v. Barr*, __ F.3d __, 2020 WL 2204198, at *4 (10th Cir. 2020), *citing Nken v. Holder*, 556 U.S. 418, 435 (2009).

In a First Amendment free exercise case, the likelihood of success on the merits will often be the determinative factor. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). This is because: (a) the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury; (b) when a law is likely unconstitutional, the government's interests do not outweigh a plaintiff's interests in having his constitutional rights protected; and (c) it is always in the public interest to prevent violation of a person's constitutional rights. *Id.* Indeed, in constitutional cases whether to grant the injunction often turn on likelihood of success on the merits only, usually making it unnecessary to dwell on the remaining three factors. *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (*en banc*) (*per curiam*). Finally, with respect to the "likelihood of success" factor, while laws are ordinarily presumed constitutional, when a law infringes on the exercise of First Amendment rights, the government bears the burden of establishing its constitutionality. *iMatter Utah v. Njord*, 774 F.3d 1258, 1263 (10th Cir. 2014). *See also Doe v. City of Albuquerque*, 667 F.3d 1111, 1120 (10th Cir. 2012) ("[The] presumption [of

constitutionality] does not apply when the challenged statute infringes upon First Amendment rights.").

**B.      The Orders Violate Plaintiffs' First Amendment Rights**

**1.      The *Hialeah* and *Roberts v. Neace* Stanard**

The First Amendment protects the "free exercise" of religion, and fundamental to this protection is the right to gather and worship.  *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts . . . [such as the] freedom of worship and assembly.").[1]  The Supreme Court has been consistent in its rigorous protection of religious freedom.  It has observed that "worship in the churches and preaching from the pulpits" occupies a "high estate under the First Amendment."  *Murdock v. Pennsylvania*, 319 U.S. 105, 109 (1943).

Pursuant to these vigorous protections, "a law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny."  *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993).  These protections apply regardless of how others may feel about the wisdom of exercising these rights.  Although a religious practice might seem abhorrent to some, 'religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.'"

---

[1] This protection was incorporated against the states in *Cantwell v. Connecticut*, 310 U.S. 296 (1940).

*Id*. at 531, *quoting Thomas v. Review Bd. of Indiana Employment Security Div*., 450 U.S. 707, 714 (1981).

In *Hialeah*, the Supreme Court noted that "[i]n addressing the constitutional protection for free exercise of religion, our cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."  508 U.S. 520, 531, *quoting Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990).  Not every regulation burdening religious practice is neutral and generally applicable, however, and a law that is neither must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.  *Id*.

The *Hialeah* Court began by addressing neutrality.  It noted that "to determine the object of a law, we must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face."  *Id*. at 533.   Specifically, "a law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language or context."  *Id*.  The Supreme Court then stated that even if a law were facially neutral, "[w]e reject the contention . . . that our inquiry must end with the text of the laws at issue."  *Id*. at 534.  "Facial neutrality is not determinative."  *Id*.  The Free Exercise Clause even "forbids subtle departures from neutrality," and "covert suppression of particular religious beliefs."  *Id*.  "Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality."  *Id*. "The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders."  *Id*.

10

The *Hialeah* Court next addressed the requirement of general applicability and noted that the "Free Exercise Clause protect[s] religious observers against unequal treatment." *Id*. at 542. "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Id*. at 543. Thus, where government restricts conduct protected by the First Amendment but "fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling." *Id*. at 546-547.

In *Roberts v. Neace*, __F.3d __ 2020 WL 2316679 (6th Cir. 2020), the Sixth Circuit considered whether it was appropriate to grant preliminary injunctive relief in a case practically identical to this case. In *Roberts* the Governor Kentucky issued orders in response to COVID-19 very similar to the Orders issued by Governor Polis and Director Ryan. The Kentucky orders prohibited in-person religious gatherings but permitted numerous similar secular activities. Three congregants of Maryville Baptist Church brought an action to vindicate their First Amendment right to the attend in-person religious services. The Sixth Circuit granted injunctive relief. *Id*., 2020 WL 2316679, at *6.

In evaluating the "likelihood of success" factor, the Court held:

> The Governor's restriction on in-person worship services likely prohibits the free exercise of religion in violation of the First and Fourteenth Amendments. [] On one side of the line, a generally applicable law that incidentally burdens religious practices usually will be upheld. *See* [*Smith*] On the other side of the line, a law that discriminates against religious practices usually will be invalidated because it is the rare law that can be justified by a compelling interest and is narrowly tailored to advance that interest. [*Hialeah*]

*Id*. 2020 WL 2316679, at *2 (internal quotation marks omitted).

11

The court noted that faith-based discrimination may come in the form of:  (a) a law motivated by animus toward people of faith; (b) a law that singles out religious activity for regulation; or (c) a law that appears to be generally applicable but is not in practice because of exceptions for comparable secular activities.  *Id*.  The court held that the Kentucky orders probably did not run afoul of the animus or singling-out prohibitions.  But the orders were invalid because they were not generally applicable.  The court stated:

> Do the four pages of exceptions in the orders, and the kinds of group activities allowed, remove them from the safe harbor for generally applicable laws?  We think so.  As a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law [Ward v. Polite, 667 F.3d 727, 738 (6th Cir. 2012)].  **At some point, an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny.'**  *Id*. at 740.

*Id*., 2020 WL 2316679, at *3 (emphasis added).

The court held that the governor's contention that the laws were in fact generally applicable was belied by the fact that there were "serial exemptions for secular activities pos[ing] comparable public health risks to worship services," including exceptions for "law firms, laundromats, liquor stores, gun shops, airlines, mining operations, funeral homes, and landscaping businesses."  *Id*.  Because the Kentucky orders were not generally applicable regulations, they were required to be subjected to strict scrutiny.  *Id*., at *4.

Under the strict scrutiny standard, a law burdening religious practice that is not neutral or not of general application "must undergo the most rigorous of scrutiny."  *Hialeah*, 508 U.S. at 546.  "To satisfy the commands of the First Amendment, a law restrictive of religious

practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Id*. (internal quotation marks omitted).  The compelling interest standard applied once a law fails to meet the *Smith* requirements is not watered down but really means what it says. *Id*. (internal quotation marks omitted).  The government must show that the burden on religious practice is the "least restrictive means" of achieving its asserted interest. *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 718 (1981).  Such a law will survive strict scrutiny only in rare cases.  *Hialeah*, 508 U.S. at 546.

In *Roberts*, the Sixth Circuit applied these standards to the Kentucky orders issued to address COVID-19 and found them to be likely unconstitutional.  The Court noted there was no question the orders burdened the plaintiffs' sincere faith practices.  2020 WL 2316679, at *4. And while the Governor identified a compelling interest in preventing the spread of the virus, the orders nevertheless foundered on the least restrictive means inquiry.  The Court noted that the the orders permitted, for example, uninterrupted functioning of typical office environments, which presumably included business meetings.  The Court asked "[h]ow are in-person meetings with social distancing any different from in-person church services with social distancing? Permitting one but not the other hardly counts as no-more-than-necessary lawmaking." *Id*.[2]

---

[2] The court suggested that a cap on the number of people in a worship service might be permissible. *Id*.  In context, however, such a cap would be unconstitutional if it were to apply to religious gatherings while similar secular gatherings were uncapped or subject to a greater cap.  Indeed, the ban on religious gatherings enjoined by the Sixth Circuit was effectively identical to Colorado's ban in terms of caps, because both capped religious gatherings at ten.  *See* "Governor Andrew Beshear's and Secretary Eric Friedlander's Response in Opposition to Plaintiff's Motions for Temporary Restraining Order and Preliminary Injunction" dated April 22, 2020, *Roberts v. Neace,* Case No. 2:20-cv-54, United States District Court for the Eastern District of Kentucky, Docket 24, pp. 35-6 (indicating that ban on Mass Gatherings applied to gatherings over ten people).

### 2.      United States Department of Justice Guidance

On April 14, 2020, United States Attorney General William Barr issued a statement declaring that the Department of Justice opposes discrimination against religious activity in the context of their COVID-19 responses.  In pertinent part, the statement said:

> . . . even in times of emergency, when reasonable and temporary restrictions are placed on rights, the First Amendment and federal statutory law prohibit discrimination against religious institutions and religious believers.  **Thus, government may not impose special restrictions on religious activity that do not also apply to similar nonreligious activity.  For example, if a government allows movie theaters, restaurants, concert halls, and other comparable places of assembly to remain open and unrestricted, it may not order houses of worship to close, limit their congregation size, or otherwise impede religious gatherings.**  Religious institutions must not be singled out for special burdens. . . . where a state has not acted evenhandedly, it must have a compelling reason to impose restrictions on places of worship and must ensure that those restrictions are narrowly tailored to advance its compelling interest.

April 14, 2020 Statement of United States Attorney General William Barr, https://www.justice.gov/opa/pr/attorney-general-william-p-barr-issues-statement-religious-practice-and-social-distancing-0 (last accessed May 24, 2020) (emphasis added).

Thus, the United States Department of Justice has affirmed that the standard of review employed in *Hialeah* and *Roberts v. Neace* is the proper standard of review with respect to government COVID-19 regulations that discriminate against religious activites.

### 3.      The Orders Burden Plaintiffs' Free Exercise Rights Under the First Amendment

Plaintiffs have sincerely held religious beliefs, rooted in Scripture's commands (e.g., Hebrews 10:25), that Christians are not to forsake the assembling of themselves together, and that they are to do so even more in times of peril and crisis.  V.Compl. ¶¶ 23-26.  And, as the court recognized in *On Fire Christian Ctr., Inc. v. Fischer*, 2020 WL 1820249 (W.D. Ky. 2020), "many Christians take comfort and draw strength from Christ's promise that 'where two

14

or three are gathered together in My name, there am I in the midst of them.'" *Id.*, at *8, *quoting* Matthew 18:20. Indeed, the court explained, the Greek word translated "church" in English Bibles is "*ekklesia*," which literally means "assembly."

In the Orders the State has invoked the enforcement provisions of C.R.S. § 25-1-114. By invoking this statute, the State has asserted that any violation of the PHO is a criminal act punishable by a $1,000 fine and up to one year in jail. Therefore, Plaintiffs would have to risk incurring these criminal sanctions if they were to assemble in a group as small as eleven persons to worship God. Thus, the Orders unquestionably and substantially burden Plaintiffs' religious practice of assembling together for worship according to their sincerely held beliefs.

The State does not appear to view church attendance as fundamental to Plaintiffs' religious exercise. In the words of the Orders, gathering together to worship God is not a "Necessary Activity" on par with the activities conducted at convenience stores; marijuana dispensaries; liquor stores; gun stores; funeral homes, airlines, mining operations, hardware stores; laundromats; banks; law offices; and accounting offices. But prohibiting the people of Colorado from attending church services while numerous non-religious gatherings are permitted under similar circumstances "violat[es] the Free Exercise Clause beyond all question." *On Fire*, 2020 WL 1820249, at *6.

Plaintiffs do not doubt Governor Polis's and Director Ryan's sincerity in trying to lessen the spread of the virus. *See Jacobson v. Massachusetts*, 197 U.S. 11, 27, 25 S.Ct. 358, 49 L.Ed. 643 (1905). Nevertheless, as the Sixth Circuit held in *Roberts v. Neace*, even in the midst of the COVID-19 virus:

> . . . restrictions inexplicably applied to one group and exempted from another do little to further these goals and do much to burden religious freedom.  Assuming all of the same precautions are taken, why can someone safely walk down a grocery store aisle but not a pew?  And why can someone safely interact with a brave deliverywoman but not with a stoic minister?  The State has no good answers. **While the law may take periodic naps during a pandemic, we will not let it sleep through one**.

*Id.*, 2020 WL 2316679, at *4 (emphasis added).

### 4.        The Orders are Neither Neutral nor Generally Applicable

The Orders are neither neutral nor generally applicable.  In *Roberts v. Neace*, the Court held that the four pages of exceptions to the orders removed them from the safe harbor of generally applicable laws.  *Id.*, 2020 WL 2316679, at *3.  The exceptions to the Colorado Orders are set forth in Exhibit F to the PHO.  Exhibit F is six pages long.  Ex. B to V.Compl. pp. 26-31.  The exemptions in the Colorado Orders are very similar to the exemptions in the Kentucky orders.  The Orders facially prohibit Mass Gatherings broadly, including faith-based gatherings, but then expressly exempt a multitude of commercial and nonreligious activities involving crowds (e.g., conducting business at, e.g., marijuana dispensaries; liquor stores; gun stores; funeral homes, airlines, mining operations, hardware stores; laundromats; banks; law offices; and accounting offices).  V.Compl. ¶ 17.  Exempted gatherings are permitted if distancing and hygiene guidelines are followed, but faith-based gatherings are prohibited even if distancing and hygiene guidelines are followed.

The Orders are also similar to the regulations enjoined in *First Baptist Church. v. Kelly*, 2020 WL 1910021 (D. Kan. 2020).  In that case, the District of Kansas issued a TRO enjoining as unconstitutional executive orders prohibiting religious gatherings of more than ten persons, even though the orders "begin with a broad prohibition against mass gatherings," because "they

16

proceed to carve out broad exemptions for a host of secular activities, many of which bear similarities to the sort of personal contact that will occur during in-person religious services." *Id*. 2020 WL 1910021, at *5.

For the same reason the Kentucky and Kansas orders were not generally applicable, the Colorado Orders are not generally applicable.  Because neutrality and general applicability are interrelated, failure to satisfy one requirement is a likely indication that the other has not been satisfied.  *Lukumi*, 508 U.S. at 531.  Thus, the Orders are neither neutral nor generally applicable.

### 5.     The Orders Fail Under Strict Scrutiny Review.

#### (a)  Introduction

Because the Orders burden Plaintiff's free exercise rights and are neither neutral nor generally applicable, they are subject to strict scrutiny.  Accordingly, the government has the burden of demonstrating that the Orders serve a compelling governmental interest in a way that is narrowly tailored to achieve that goal through the least restrictive means.

#### (b)  The Orders do Not Serve a Compelling Interest

There is an important difference between, on the one hand, **identifying** a compelling governmental interest, and, on the other hand, demonstrating that the regulation under scrutiny **serves** that interest.  In this case there is little question that the government has identified a compelling interest in addressing the COVID-19 virus.  *On Fire*, 2020 WL 1820249, at *7.  But where the government permits regular large gatherings of persons for commercial and non-religious purposes, while prohibiting faith-based gatherings, the assertion that the regulation serves a compelling interest fails.  It is well-established in strict scrutiny

jurisprudence that "a law cannot be regarded as protecting an interest 'of the highest order' . . .

when it leaves appreciable damage to that supposedly vital interest unprohibited." *Hialeah* 508

U.S. 520, 546–47, *quoting The Fla. Star v. B.J.F.*, 491 U.S. 524, 541-42 (1989). Thus, while

the government has certainly identified a compelling interest, there is substantial question

regarding whether the Orders actually serve that interest.

### (c) The Orders are Not Narrowly Tailored

Even assuming for the sake of argument that the Orders serve a compelling

governmental interest, they nevertheless fail under strict scrutiny, because they are not narrowly

tailored to serve that interest through the least restrictive means.

The State cannot carry its burden to demonstrate the Orders are narrowly tailored

because it cannot demonstrate that it seriously undertook to consider other, less-restrictive

alternatives and ruled them out for good reason. To meet this burden, the State must show that

it "seriously undertook to address the problem with less intrusive tools readily available to it,"

meaning that it "considered different methods that other jurisdictions have found effective."

*McCullen v. Coakley*, 573 U.S. 464, 494 (2014). The State cannot meet its burden by showing

"simply that the chosen route is easier." *Id.* at 495. Thus, the State "would have to show either

that substantially less-restrictive alternatives were tried and failed, or that the alternatives were

closely examined and ruled out for good reason." *Bruni v. City of Pittsburgh,* 824 F.3d 353,

370 (3d Cir. 2016) (emphasis added). Furthermore, "[i]t is not enough to show that the

Government's ends are compelling; the means must be carefully tailored to achieve those

ends." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). There must be a fit

between the ends and the means chosen to accomplish those ends.  *Sorrell v. IMS Health*, *Inc*., 564 U.S. 552, 572 (2011).

The State utterly fails this test.  The State tried nothing else.  For religious gatherings, it considered nothing but a complete prohibition, while expansively exempting numerous businesses and non-religious entities, such as convenience stores; marijuana dispensaries; liquor stores; gun stores; funeral homes, airlines, mining operations, hardware stores; laundromats; banks; law offices; and accounting offices.  V.Compl. ¶ 17.  The State has not and cannot state why or how crowds of hundreds at a Lowes (V.Compl. ¶ 21) are any less "dangerous" to public health than a responsibly distanced and sanitized worship service of 50 people.  Yet the State exempted the non-religious gatherings and prohibited Plaintiffs' church services.

As the court stated in *On Fire*, the State is unlikely to be able to demonstrate that it deployed the least restrictive means because the Orders (like the regulations at issue in that case) are "underinclusive" and "overbroad."  They are underinclusive because they do not prohibit a host of equally dangerous (or equally harmless) activities that the State has permitted. *On Fire*, 2020 WL 1820249, at *7.  "The Court does not mean to impugn the perfectly legal business of selling alcohol, nor the legal and widely enjoyed activity of drinking it.  But if beer is "essential," so is Easter." *Id*.; *see also First Baptist*, 2020 WL 1910021, at *7 (D. Kan. 2020).

Moreover, the Orders are overbroad, because the State cannot show that it is necessary to ban *every* church or other religious service or activity throughout the state where more than ten people are present.  Centers for Disease Control guidance for faith-based organizations recommends a graduated approach based on community risk.  Such an individually tailored, less-restrictive means is absent from the blanket  statewide approach of the Orders.

19

Finally, the State offers no justification whatsoever for why voluntary compliance has failed to satisfy the compelling public health interest or why criminal penalties are necessary to promote compliance by Coloradans engaged in religious services or activities (but not, e.g., by those engaged in business with marijuana dispensaries; liquor stores; gun stores; or Lowes ). Indeed, the continued reliance on voluntary social- distancing and hygiene restrictions for Mass Gatherings in dozens of other categories suggests the burdens on religious services or activities – under penalty of arrest, imprisonment or criminal fine – are not the least-restrictive option to satisfy the State's compelling interest.

The State's failure to tailor its restrictions to closely fit the safety ends it espouses, and its failure to try other, less restrictive alternatives that have worked and are working in other jurisdictions across the country, demonstrates that the State cannot satisfy its burden to prove narrow tailoring. Thus, the State's enforcement of the Orders fails strict scrutiny, and injunctive relief is warranted.

### 6. Plaintiffs Have Demonstrated a Substantial Likelihood of Success on the Merits

In summary, for the foregoing reasons, Plaintiffs have demonstrated a substantial likelihood of success on the merits.  Therefore, the first factor of the standard for injunctive relief is satisfied.

## C. Other Factors

As noted above, in constitutional cases whether to grant an injunction often turn on likelihood of success on the merits only, usually making it unnecessary to dwell on the remaining three factors.  *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430

(6th Cir. 2014) (en banc) (per curiam).  Nevertheless, Plaintiffs will briefly address these elements.  The Supreme Court recognizes that the deprivation of "First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Plaintiffs' constitutional rights have been violated by the State and will continue to be violated absent immediate relief.  The equities favor Plaintiffs because the law places a premium on protecting constitutional rights.  The State's church-closure order irreparably harms Plaintiffs' constitutional freedoms and significantly hinders their ministry to their parishioners and community.  Meanwhile, an injunction will not harm the State at all.  The State can achieve any valid interest through valid orders.  It need not apply an order unconstitutionally burdening the free exercise of religion.  The State is free to enact permissible and reasonable regulations on church services, including narrowly-tailored social distancing and gathering conditions.  Finally, "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd' sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) (quotations omitted).  This is particularly true for First Amendment freedoms.  Because the requested injunction will accomplish this, the public interest also favors an order protecting Plaintiffs.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court to enter a temporary restraining order and a preliminary injunction enjoining the State from imposing criminal

penalties (including fines and jail time) for engaging in corporate worship in the Church's sanctuary.

Respectfully submitted this 25th day of May 2020.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
3801 East Florida Avenue
Suite 830
Denver, Colorado 80210
Voice:  (303) 205-7870
Fax:  (303) 463-0410
Email:  barry@arringtonpc.com
Attorney for Plaintiffs

22