**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-1480-RM-MEH

HIGH PLAINS HARVEST CHURCH; and
MARK HOTALING,

      Plaintiffs,

v.

JARED POLIS, in his official capacity as Governor of the State of Colorado; and
JILL HUNSAKER RYAN, in her official capacity as Executive Director of the Colorado
Department of Public Health and Environment,

      Defendants.

_____

**PLAINTIFFS' SUPPLEMENT TO THEIR**
**MOTION FOR PRELIMINARY INJUNCTION**
_____

Pursuant to the Court's June 16, 2020 Order, Plaintiffs submit the following Supplement
to their Motion for Preliminary Injunction.

**A.      Plaintiffs Incorporate Their June 10 Motion**

Plaintiffs incorporate the legal authorities and evidence set forth in their June 10, 2020
Motion for Preliminary Injunction (ECF No. 35.).

**B.      The State Admits the George Floyd Protests Have Drawn Thousands**

In its June 12, 2020 Response to Plaintiffs' renewed motion (ECF No. 39; "Response"),
the State wrote:  "Protests started in Denver on the evening of May 28, 2020 and have
continued since.  The protests have drawn thousands of people and have involved law
enforcement and the media."  Response, 3.  The State thus admits that the George Floyd
protests to which it refers (which will be referred to herein as the "Protests") have resulted in

1

gatherings of thousands of people.  The gatherings have been held in flagrant disregard of the gathering size and social distancing provisions of the Orders (the term "Orders" has the same meaning as in Plaintiffs' June 10, 2020 motion).

**C.    The Orders' Burden on Free Exercise Rights is Even Less Justified Now Than a Few Weeks Ago**

The Colorado Department of Public Health and Environment (the "Department") maintains a website in which it tracks hospitalizations in Colorado due to Covid-19.  According to this website, as of June 30, 2020, there were only 139 people in the hospital with COVID-19 in the entire State of Colorado.[1]  With hospitalizations due to the virus plummeting, the Orders' restrictions on the free exercise rights of the people of Colorado are even less justified than they were weeks ago when this case began.

**D.    The State Did Nothing to Stop the Protests and Thus Permitted Them**

The State asserts that the Orders do not permit the Protests.  Response, 3.  And it is true that on their face the Orders do not.  But as this and following sections demonstrate, the State has indisputably granted to the persons participating in the Protests a *de facto* exemption from the Orders.  Such a *de facto* exemption implicates First Amendment scrutiny every bit has much as if the exemption were written into the Orders expressly, because even if a law is facially neutral, "[w]e reject the contention . . . that our inquiry must end with the text of the laws at issue."  *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 534 (1993) (hereinafter, "*Hialeah*").  "Facial neutrality is not determinative."  *Id*.  The Free Exercise Clause forbids even "subtle departures from neutrality."  *Id*.

The State is playing word games when it denies that it permitted the Protests.  The word "permit" can mean "to grant permission."  *Random House Dictionary*.  It can also mean "to

---

[1] See https://covid19.colorado.gov/hospital-data

allow to do something." *Id.* When the State says it has not permitted the Protests, it confines the meaning of the word to the second sense. Whatever the merits of that statement,[2] there is no question that the statement is false under the second sense of the word. Tellingly, nothing in the State's Response indicates that it lifted a finger to stop the Protests, which were in clear violation of the Orders. It is more than a little disingenuous for Governor Polis to say that he did not "permit" the Protests when they occurred literally feet from his office, and he did nothing to disperse them. It is perhaps reasonable to argue about whether it was prudent for Governor Polis to decide to stand down, do nothing, and permit the Protests to occur day after day, all the while knowing they were being conducted in gross violation of the Orders. It is absurd to suggest that Governor Polis did not make that decision in the first place.

E.      **The Department Permitted and Encouraged the Protests**

The Department has not merely passively permitted the Protests to occur in violation of the Orders; it has also affirmatively encouraged them. Exhibit 12 to the State's Response is "Guidance for people attending protests" ("Protester Guidance") issued by the Department. If the Department intended to enforce the Orders with respect to the Protests, this "guidance" would have been unnecessary. The only guidance the Department would have needed to issue in that case would be: "The Sixth Amended Order provides that gatherings or events of more than 10 people are not authorized to occur, and anyone who violates this prohibition is subject to prosecution." Of course, the Department never had any intention of enforcing the Orders against the protesters, a position it communicated tacitly by issuing the Protester Guidance in the first place and expressly with the following passage:

> **It is important for people to be able to demonstrate peacefully and have their voices heard**. We strongly encourage all participants – protestors, law enforcement, and members of the media – to follow these guidelines to stay safe

---

[2] The assertion is also false in the second sense of "to grant permission" as set forth in the next sections.

and protect themselves from COVID-19 transmission if attending protests or demonstrations.

Protester Guidance, p. 1 (emphasis added)

The guidance continues: "Wearing a mask is very important if you plan to gather in **large groups** . . ." Protester Guidance, p. 2 (emphasis added). "Everyone who participates in protests or demonstrations should monitor themselves . . ." *Id*. The Protester Guidance presupposes that protests in "large groups" are going to occur. Nowhere does the Protester Guidance state that protests in "large groups" are unlawful. Nowhere in the Guidance does the Department demand that protesters comply with the limits on gathering size set forth in the Orders.

Indeed, the Protester Guidance was clearly intended to guide and encourage the Protests. We know this because the guidance was issued in the wake of, and quotes from, a statement issued by the American Public Health Association[3] encouraging the George Floyd protests. The full statement APHA statement is as follows:

'I can't breathe.'

With those last words, George Floyd, an unarmed, handcuffed black man, died this week after being pinned down by a white Minneapolis police officer, an atrocious action that has sparked outrage throughout the nation.

We raise our voices, too, horrified, stunned and angered.

We are appalled but are not surprised by the despicable way Floyd was killed. We weep for the man, his family and a country that continues to allow this to happen. We also join in the chorus for justice and ring the alarm to all Americans. Racism is a longstanding systemic structure in this country that must be dismantled, through brutally honest conversations, policy changes and practices.

---

[3] *See* "Racism is an ongoing public health crisis that needs our attention now" dated May 29, 2020 and found at https://www.apha.org/cdnews-and-media/news-releases/apha-news-releases/2020/racism-is-a-public-health-crisis,

Racism attacks people's physical and mental health.  And racism is an ongoing public health crisis that needs our attention now!

**We see discrimination every day in all aspects of life, including housing, education, the criminal justice system and employment.  And it is amplified during this pandemic as communities of color face inequities in everything from a greater burden of COVID-19 cases to less access to testing, treatment and care.**

Americans cannot be silent about this.
As Martin Luther King, Jr. observed, 'The ultimate tragedy is not the oppression and cruelty by the bad people but the silence over that by the good people.'

We refuse to be silent, and we call for you to join us in our advocacy for a healthier nation.  At the American Public Health Association, every moment of our waking hours is poured into finding better, more healthful lives for all, so everyone has a chance to breathe.  It's our life-blood.

(emphasis added)

The Department quoted the paragraph in bold word-for-word in its Protester Guidance. Any assertion that the guidance was not directed specifically to, and issued for the benefit of, the George Floyd protesters is not tenable.

In her declaration, State Epidemiologist Rachel Herlihy states the Department "has not encouraged people to join any Protests on any subject matter." (¶ 72).  This is not accurate. Immediately, after quoting from the APHA's statement, the Protester Guidance affirmatively states: "**We want you to use your voice for issues that are important to you.  Please do so safely**." (emphasis in the original).  It is difficult to imagine a clearer statement demonstrating that the Department approved and encouraged the Protests.

Finally, as if the Department's position regarding the Protests were not clear enough, on or about June 15, 2020, it issued a statement in which it stated that it continues "to do everything possible to limit and slow the spread of COVID-19, **but we also acknowledge that**

**the scourge of systemic racism weighs heavily on the public's mind, and understand the need to protest or demonstrate peacefully**." Hotaling Dec. ¶ 9 (emphasis added).

In summary, the Protester Guidance presupposes the Protests will occur and affirmatively approves and encourages them.  The Department issued a statement declaring that there is a "need" to protest and demonstrate.  Any suggestion that the Department did not affirmatively encourage the Protests is wholly without merit.

### F.   Governor Polis Permitted and Encouraged the Protests

#### 1.   Governor Polis Expressed Solidarity with and Commended the Protesters

On May 29, 2020 Governor Polis issued a statement in which he stated:

> We are all filled with grief about the unjust murder of George Floyd and **I stand ready to join hands with those hurting today as we peacefully work for justice**. Today is a new day and it is my hope and the hope of all Coloradans that any future Protests remain peaceful.  To those peacefully protesting at a safe social distance, know that I see you and I am listening.

Hotaling Dec. ¶ 4; Exhibit B (emphasis added).

On June 2, 2020 Governor Polis held a press conference.[4]  Hotaling Dec. ¶ 2.  At the press conference he reiterated the sentiments expressed in his May 29 statement:  "And to those who are peacefully protesting, I want you to know that I see you, I hear you, and I grieve with you.  And more importantly, I want to work with you to make Colorado better and America better."  Hotaling Dec. ¶ 3(a); Video, 3:46 to 4:03.  He stated further:  "I **commend** those who peacefully join in the Protests . . ."  Hotaling Dec. ¶ 3(b); Video,4:37 to 4:42 (emphasis added).

---

[4] A video of the June 2 press conference ("Video") is set forth here:  https://www.cpr.org/2020/06/02/watch-video-polis-colorado-coronavirus-update-9/.  Hotaling Dec. ¶ 2.

2. **Governor Polis Affirmatively Stated He Would Not Enforce the Orders Against the Protesters**

Not surprisingly, after expressing solidarity with and commending the protesters,

Governor Polis assured them he would not enforce the Orders to prevent the Protests, because it

was "impossible" for the protesters to stay at home.  He said:

> And by the way, I respect the fact that many Coloradans who joined the Protests concluded it is not possible to stay at home.  It is not possible to remain silent in the face of the killing of George Floyd, in the face of ongoing racial discrimination.  And I completely respect the fact that those Coloradans consider that essential and they would consider it unconscionable to remain at home.  **So staying safer at home wasn't possible.  And we would not ask anybody to stay at home when it's not possible and when your conscience does not allow you to stay at home**.

Hotaling Dec. ¶ 3(i); Video 22:28 to 23:10 (emphasis added).

3. **Governor Polis Rejected Calls to Disperse the Protests**

Governor Polis categorically rejected calls to disperse the Protests.  He stated:  "It is

also divisive and sad to hear some call for a more violent crackdown against peaceful

demonstrators exercising their First Amendment rights under our Constitution . . . This is not

China.  This is not Tiananmen Square, and that's not leadership."  Hotaling Dec. ¶ 3(c);

Video 5:07 to 5:31.

4. **Instead, Governor Polis Dispatched the Colorado National Guard to Support the Protests**

Instead of enforcing the Orders and dispersing the protesters, on June 1, 2020 Governor

Polis issued a joint statement with Denver Mayor Michael Hancock in which they stated:

> Denver police, our mutual aid partners and a small contingent of Colorado National Guard have been working for the past four days and nights **to support peaceful protests in Denver** . . .

Hotaling Dec. ¶ 7; Exhibit C (emphasis added).

The governor also applauded local law enforcement's decision to actually join the Protests:  "I was glad to see the Denver Police Chief yesterday join arm-in-arm with those who exercised their free speech to protest the unjust murder of George Floyd."  Hotaling Dec. ¶ 3(d); Video, 6:40 to 6:51.

**5.      Governor Polis Wanted to Set an Example to Other Governor by Aiding the Protesters Through the Distribution of Masks**

At his June 2 press conference Governor Polis related that he had been in a conference call in which he discussed the distribution of masks to aide the protesters:

> Of course I expressed on the call the concern that protesters might encounter corona virus and that could lead to public health setbacks.  I talked about how masks were made available for some of the protesters in Colorado and how we are encouraging testing.  **And I hope that serves as an example to governors in other states to open up testing and to the extent they can, masks**, to help keep those who are exercising their First Amendment rights as safe as possible.

Hotaling Dec. ¶ 3(j); Video  33:32 to 34:01 (emphasis added).

Far from undertaking his constitutional duty to ensure the faithful execution of the laws of the State, Governor Polis was proud of the fact that masks were distributed to make the lawbreakers safer.

**6.      Summary**

In summary, in his public statements Governor Polis left no doubt that he was in solidarity with and supported the protesters.  He affirmatively rejected calls to disperse the Protests.  He even went so far as to dispatch troops to support the Protests.  Instead of stopping the Protests, he applauded the distribution of masks to the protesters.  The State's assertion that Governor Polis did not permit nor encourage the Protests does not stand up under the slightest scrutiny.

**G.      Governor Polis Knew the Protests Presented an Extreme Risk of Spreading the Virus That is Greater Than the Risk of Organized Events**

Governor Polis knew the Protests were not safe.  In his press conference he stated, "It is not safe to be clustered together in a small outdoor areas."  Hotaling Dec. ¶ 3(h); Video 14:38 to 14:43.  Moreover, the governor's own public health experts informed him the Protests posed a catastrophic risk.  He said:

> One of my greatest fears in watching the events over the last weekend is that so many people gathering in one place together will increase the spread of corona virus across our nation and here in Colorado.  Only in the coming weeks will we see the full impact of these large gatherings.  **But health experts tell me it could result in hundreds of new cases and untold pain, death and suffering** just as we were making progress.  At least I was glad to see many protesters, hopefully most, wearing masks to protect themselves and those around them from corona virus.

Hotaling Dec. ¶ 3(e); Video 7:42 to 8:24 (emphasis added).

The public health risks of the Protests weighed on Governor Polis to such a degree that he lost sleep:

> You know we need to remember that we are dealing with a global pandemic.  And we should all be wearing masks whenever we are interacting with others outside of our household and take the proper precautions in every situation to try to be six feet from others.  And while it was encouraging to see so many of the protesters do that, **as governor it certainly kept me up at night worrying about thousands or tens of thousands of people congregating and the health risk to our state** for this justified cause.

Hotaling Dec. ¶ 3(g); Video 11:04 to 11:40 (emphasis added).

The governor even admitted that the Protests are **riskier** than organized activities (activities such as the church services Plaintiffs wish to conduct):

> That's one of the real public health issues around these large protests, is [] you can't do meaningful contact tracing other than that if there is a group of people that went together . . . **That's why it is of a very different nature than an organized sport or an activity where we know who's doing it**.

Hotaling Dec. ¶ 3(k); Video 35:03 to 36:29 (emphasis added).

**H.** **This Case is Distinguishable from *South Bay* on Several Grounds**

Plaintiffs sought a temporary restraining order on the ground that the State is violating their free exercise rights and their free speech rights.  In its June 16, 2020 order, the Court focused exclusively on Plaintiffs' free exercise claim, and, citing the Supreme Court's recent decision in *South Bay United Pentecostal Church v Newsom*, 2020 WL 2813056 (U.S. 2020) ("*South Bay*"), the Court denied the motion.  South Bay is distinguishable from this case on three grounds, each of which will be discussed in more detail below.

1. *South Bay* is distinguishable on free exercise grounds (the issue before the Supreme Court in that case), because the record now before the Court shows that the State is discriminating against religious gatherings by imposing restrictions on such gatherings that it does not impose on comparable – indeed far riskier – secular gatherings.

2. *South Bay* is distinguishable because free speech was not a significant issue in that case, which was decided on free exercise grounds.  But in this case Plaintiffs have demonstrated that in addition to violating their free exercise rights, the State has engaged in viewpoint discrimination in violation of their free speech rights.

3. Because the State has violated Plaintiffs' free exercise rights as well as an independent constitutional right, this is a "hybrid" case, while *South Bay* was not a hybrid case.

**I.** **The State Violated Plaintiffs' Free Exercise Rights Under a South Bay Analysis**

*South Bay* was not decided on its merits.  *Id*., 2020 WL 2813056 *2 (2020) (Roberts, C.J., concurring) (noting that case's "interlocutory posture" prevented it from being "indisputably clear," as required, that the restriction was unconstitutional).  Nevertheless, Justice Roberts' concurrence is instructive, and in that concurrence, he wrote that there could be reasonable disagreement concerning whether the secular activities the State of California

allowed to open were truly comparable to religious gatherings that were not allowed to open. On the other hand, according to Justice Roberts, the secular gatherings that were closed – such as spectator sports –  were being treated the same as religious gatherings.  Thus, *South Bay* rests on a determination that it was probable that the government was treating truly comparable secular activities the same as religious activities.

The key to this determination, according to Justice Roberts, was whether the state was treating "large [secular] groups of people gather[ing] in close proximity for extended periods of time" differently from similar religious gatherings.  *Id*.  Under this standard, the State of Colorado has violated Plaintiffs' free exercise rights, because it has treated large secular groups gathering in close proximately for extended periods of time differently from the similar (actually far smaller and less risky) gatherings Plaintiffs propose to conduct.

The State attempts to distinguish *South Bay* on the ground that the Protests are conducted outdoors while religious services are conducted indoors.  The State's attempt to distinguish *South Bay* fails for several reasons.  First, it is not true that religious gatherings are always conducted indoors.[5]  Red Rocks Amphitheater has a capacity of over 9,000 people. Hotaling Dec. ¶ 5.  Anyone who has ever been to a jam-packed Easter service at Red Rocks knows that religious gatherings with thousands in attendance can be conducted outdoors.  The State's attempt to distinguish *South Bay* on the indoor/outdoor distinction fails, because the State would not permit outdoor religious gatherings that were otherwise identical to the Protests.

Second, the State's analysis ignores a glaringly obvious fact.  It is absurd to suggest that a gathering of thousands of demonstrators standing next to each other chanting slogans is safer

---

[5] The Orders themselves acknowledge this.  *See* June 12 Response, 11.

than a gathering of 150 worshipers in the Church's sanctuary, even if the former is conducted outdoors and the latter is conducted indoors.  Governor Polis stated that his health experts told him that the Protests could "result in hundreds of new cases and untold pain, death and suffering."  Video 7:42 to 8:24.  By the governor's own admission, the State understands that the Protests could result in far more COVID-19 **cases** than the number of **participants** at Plaintiffs' worship services.

Third, Plaintiff's worship services are organized events where the participants are known.  Governor Polis acknowledged that the Protests are riskier than such organized events, because while contact tracing is obviously possible where the participants in an event are known, there is no way to conduct meaningful contact tracing for participants in the Protests.

Fourth, Defendants have said nothing indicating the *de facto* exemption from the Orders the State has extended to the Protests is limited to outdoor gatherings.  And judging from the extraordinary deference the State has extended to every aspect of the Protests, we can be virtually certain that if a memorial/protest for George Floyd were held in a church building, the State would do nothing to stop it and probably actively encourage it.

Finally, the State's indoor/outdoor distinction is foreclosed by Justice Roberts' concurrence itself.  Justice Roberts included large gatherings of people for "spectator sports" among the gatherings that are comparable to religious gatherings.  Large gatherings for spectator sports are very often conducted outdoors.  Therefore, the indoor/outdoor distinction is irrelevant to the constitutional analysis in his concurrence.

In summary, there can be no reasonable argument that the Protests that the State permitted and encouraged are safer than the religious gatherings Plaintiffs desire to hold.  It follows that the State is treating comparable – indeed far riskier – secular gatherings differently

than religious gatherings.  Therefore, the State's application of its Orders fails under a *Hialeah* analysis.

**J.**      **The Orders, as Applied, are Massively Underinclusive and Thus Not Generally Applicable**

Under *Hialeah*, a law is not generally applicable if it is substantially underinclusive. Additionally, the Supreme Court has recognized that "in circumstances in which individualized exemptions from a general requirement are available, the government may not refuse to extend that system to cases of religious hardship without compelling reason."  *Hialeah*, 508 U.S. at 437 (internal quotations omitted).  Thus, when an otherwise general rule allows an "individualized government assessment of the reasons for the relevant conduct" as a basis for granting an exemption, the rule must undergo strict scrutiny.  *Smith*, 494 U.S. at 884.  Here, the Orders purport to mandate a general limit on non-essential gatherings across the State.  But the Orders are chockablock with express exemptions, and the State has granted a *de facto* individualized exemption to the Protests.  While the State both tacitly and expressly approved these other comparable (indeed, riskier) gatherings, it has insisted that limits on religious gatherings remain in place.  This is exactly the type of disparate individualized assessment that must pass strict scrutiny under the Free Exercise Clause.

Aside from the individualized exemption problem, the Orders are also "underinclusive in relation to [their] asserted secular goals."  *Cent. Rabbinical Cong. of U.S. & Canada v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 186 (2d Cir. 2014).  They are underinclusive because they "regulate[] religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it."  *Id*. at 197.   The Protests have almost all involved large crowds in which people stand in close proximity to each other for an extended time – the very characteristics typically invoked

13

to justify restrictions on churches.  *See, e.g., Antietam Battlefield KOA v. Hogan*, 2020 WL

2556496, at *8 (4th Cir. 2020) (noting that religious services involve "a group congregating near

one another for a longer period" and "prolonged exhalation of respiratory droplets" rather than

"casual contact"); *see also Cassell v. Snyders*, 2020 WL 2112374, at *9 (N.D. Ill. 2020) (stating

that "religious services involve sustained interactions between many people" and are thus

justifiably restricted).  The protesters are engaging on a massive scale in the precise type of

conduct that allegedly harms the government's interest in protecting people from COVID-19,

and yet the State exempted the Protests from the Orders, while religious gatherings – even

gatherings such as Plaintiffs' that are smaller than the Protests by orders of magnitude – are not

exempted from the Orders.

     The State asserts that Plaintiffs have not alleged that the disparate treatment on religious

services results from animus.  Plaintiffs have not focused on the "animus" issue, because

animus is irrelevant to the constitutional analysis.  "[A]nimus, pure and simple," is not required

to conclude that a law "singl[es] out a religious practice for special burdens."  *Cent. Rabbinical

Cong. of U.S. & Canada*, 763 F.3d at 197.  The constitution requires government neutrality, not

just "governmental avoidance of bigotry."  *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245,

1260 (10th Cir. 2008).  The non-neutrality here has become all the more evident as thousands

of protestors congregate shoulder-to-shoulder on streets and sidewalks across the State to

demonstrate against racism.  Defendants' solicitude for the Protests, combined with their

ambivalence (at best) at the ongoing burdens on religious services, is enough to render their

Orders non-neutral and thus subject to strict scrutiny.

**K.**    **The State Has Been Remarkably Candid About its Viewpoint Discrimination**

     In his June 2 press conference Governor Polis stated:

> There's no doubt that those who congregated [in the Protests] faced an increased
> risk of infection. . . . Exercising our First Amendment rights of speech of
> gathering is a constitutionally protected right, and we want to make sure that
> everybody doing it is as safe as possible.

Hotaling Dec. ¶ 3(f); Video 8:49 to 9:52

Governor Polis stated that he was willing to allow the Protests to proceed – even while acknowledging they presented an increased risk of infection – because he wanted to protect the First Amendment rights of the protesters.  But why does he want to protect the protesters' First Amendment rights and not Plaintiffs' First Amendment rights?  They are the exact same right after all.  The reason for the disparate treatment is, of course, because Governor Polis favors the protesters' message over Plaintiffs' message.  He told the protesters he hears them and wants to work with them to make Colorado a better place.   Video, 3:46 to 4:03.  He said that the protesters cause is so vitally important and just that he understands it is literally impossible for them to obey the Orders and stay at home.  Video 22:28 to 23:10.  He applauded the Denver Police Chief for walking arm-in-arm with the protesters.  Video, 6:40 to 6:51.  He dispatched troops to support the protesters.  Ex. C.  Why did he do all of this?  Because he says the protesters' cause is "justified."  Video 11:04 to 11:40.  Plaintiffs do not dispute that a message advocating for racial justice is a just message.  It clearly is.  But the government is constitutionally prohibited from favoring the speech rights of those advocating even a just message over the speech rights of people engaging in religiously motivated speech.

In summary:

1.  The State permitted and even encouraged the Protests even while the governor's health experts were advising him that the Protests could result in hundreds of new cases, which advice literally kept the governor up at night with worry about the health risk to the State.

2.  While permitting and encouraging thousands of protesters to congregate to exercise their First Amendment rights, the State continues to clamp down on the First Amendment rights of religious persons.

3.  The reason for the disparate treatment is the Defendants' belief that the protesters' message is a worthy and just message that must be gotten out no matter the increased risk of adverse public health consequences, while it does not consider Plaintiffs' religious message to be in the same category.

**L.      Viewpoint Discrimination is Constitutionally Odious**

On May 30, 2020, a group of 1,288 people, including numerous public health and infectious diseases professionals, issued an open letter that was widely reported in the media. Hotaling Dec. ¶ 6; Exhibit A.  In this letter the healthcare professionals addressed the public health response to the George Floyd protests around the country and stated, "[As] public health advocates, we do not condemn these gatherings as risky for COVID-19 transmission.  We support them as vital to the national public health . . . This should not be confused with a permissive stance on all gatherings, particularly protests against stay-home orders."

Viewed strictly from the perspective of the risk of COVID-19 transmission, the healthcare professionals' assertion is ridiculous.  The risk of infection from COVID-19 for a crowd of protesters advocating for racial justice is the same as the risk for an identical crowd advocating for an end to stay-home orders.  The virus is indifferent to the crowd's message.

The healthcare professionals obviously did not view the public health issue strictly from a risk of transmission perspective.  Instead, for them, the risk of infection is only part of a wider healthcare analysis that includes the perceived public health advantages of advancing an anti-racist message.  The signers of the letter engaged in a cost/benefit analysis, and in their

judgment the healthcare benefits furthered by the George Floyd demonstrators' advocacy of social justice outweigh the costs of that advocacy in terms of greater COVID-19 infections, while the benefits of stay-home protests do not. In other words, the signers of the letter urged public officials to engage in viewpoint discrimination in their application of their healthcare regulations.

That is exactly what the State has done in this case. In doing so, however, the State has run afoul of the Constitution, because government regulation based on the views taken by speakers is an "egregious" and "blatant" violation of the First Amendment. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995).[6] For that reason, content-based laws "are presumptively unconstitutional" and must undergo strict scrutiny. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015).

The Supreme Court recently clarified that a restriction on speech is content-based if it regulates speech based on its "function or purpose," regardless of whether the government has a benign motive or whether the law defines regulated speech by a particular subject matter. *Id*. at 2227. Thus, a law prohibiting brand name drug manufacturers from using data for the purposes of "marketing," but not for the purpose of "education," was facially content-based, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565-66 (2011), as was a municipal sign code regulating signs differently based on whether they were "ideological," "political," or "temporary direction[al]," *Reed*, 135 S. Ct. at 2224, 2230.

---

[6] Freedom of speech, assembly, and expressive association are "cognate rights. " *Thomas v. Collins*, 323 U.S. 516, 530 (1945). Thus, they can be analyzed together for purposes of the Orders' restrictions on Plaintiffs' religious expression. This discussion focuses on free speech, but the principles are equally applicable to Plaintiffs' freedom of association claim.

In their services, Plaintiffs' engage in preaching, teaching, praying, singing praises to God, Bible reading and otherwise proclaiming the Gospel of Jesus Christ to the world.[7]  These expressive activities are quintessential protected expression, because private religious speech is as fully protected under the Free Speech Clause as secular private expression.  *Summum v. Callaghan*, 130 F.3d 906, 913-14 (10th Cir. 1997), *citing Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995).  Yet the Orders impose restrictions on Plaintiffs' religious assemblies that do not apply to similarly situated (indeed, far riskier) secular gatherings.  The restrictions on Plaintiffs' gatherings apply based on the religious content of these expressive assemblies.  Astoundingly, given the *de facto* exemption from the application of the Orders extended to participants in the Protests, if law enforcement personnel were to happen upon a gathering of more than 50 people, they would first have to evaluate the purpose of the group by considering the content of its speech before deciding whether to enforce the restrictions in the Orders.  Is the group protesting the death of Mr. Floyd?  Then it is allowable.  Are they praying, preaching, singing praises, or proclaiming the Gospel of Jesus Christ to the world?  All of those things are forbidden.

Even more bizarre, the State's application of the Orders would require viewpoint discrimination even among different kinds of religious gatherings.  The Bible teaches that racism is a sin.  James 2:4.  Suppose a pastor gathers hundreds for the purpose of memorializing George Floyd and preaching a sermon attacking the sin of racism.  That sermon would presumably fall within the *de facto* exemption.  But if the pastor across the street gathered an identical crowd to hear a sermon about any other subject, it would be illegal.

---

[7] Hotaling Dec. ¶ 8.

In summary, the State has clearly engaged in constitutionally prohibited content-based discrimination at several levels, and therefore its actions are subject to strict scrutiny.

**M.      Strict Scrutiny is Applicable Under the "Hybrid" Claim Doctrine**

In its June 16, 2020 order, the Court did not address Plaintiffs' free speech claim.  The free speech claim is important, however, because it sets this case apart from *South Bay*.  Not only is *South Bay* distinguishable on its own terms (which addressed only the free exercise issue), but it is also distinguishable because there was no element of viewpoint discrimination at issue in that case.  Therefore, this is a "hybrid" case, and the First Amendment bars the State's actions even if it were able to show that the Orders are neutral, generally applicable laws.  *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 881 (1990).

The Tenth Circuit has recognized the hybrid claim doctrine.  *Grace United Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 655–56 (10th Cir. 2006).  Under Tenth Circuit precedent, a party establishes a violation of the free exercise clause even in the case of a neutral law of general applicability by showing that the challenged governmental action compromised both the right to free exercise of religion and an independent constitutional right.  *Id.*, 451 F.3d at 655-56.  A plaintiff need only demonstrate that the companion constitutional claim is "colorable," meaning that the plaintiff must show a fair probability or likelihood, but not a certitude, of success on the merits.  *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297 (10th Cir. 2004).  In this case the evidence shows far more than a "colorable" claim of viewpoint discrimination.[8]  Defendants do not conceal that they have discriminated in favor of the Protests

---

[8] The State asserts that Plaintiffs did not assert free speech as a ground for injunctive relief (Response, 26).  This is difficult to understand, because a viewpoint discrimination claim is a free speech claim, and the State acknowledges that Plaintiffs made such a claim (Response, 25).

on the basis of the favored message communicated in those Protests.  Accordingly, Plaintiffs have established probable success on the merits of their hybrid rights claim.

**N.      The Orders Fail Strict Scrutiny**

The Orders are subject to strict scrutiny under a free exercise analysis, a free speech analysis and a hybrid analysis.  Strict scrutiny "is the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).  Notably, "[i]t is established in [the Supreme Court's] strict scrutiny jurisprudence that 'a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.'" *Id*. at 547 (ellipses in original) (*quoting Florida Star v. B.J.F.*, 491 U.S. 524, 541-42 (1989)).

As the Tenth Circuit puts it, "[a] law's underinclusiveness – its failure to cover significant tracts of conduct implicating the law's animating and putatively compelling interest – can raise with it the inference that the government's claimed interest isn't actually so compelling after all."  *Yellowbear v. Lampert*, 741 F.3d 48, 60 (10th Cir. 2014) (Gorsuch, J.). *See also Williams v. Annucci*, 895 F.3d 180, 189-90 (2d Cir. 2018) ("a policy's underinclusiveness suggests that the proffered interest is not quite as compelling as the government claims.").

Here, the State cannot demonstrate that it has a compelling interest in applying the Orders to the Plaintiffs – particularly where Plaintiffs abide by all social distancing and hygiene practices incumbent on other exempted activities.  On their face the Orders exempt numerous secular gatherings from the gathering-size limits.  Moreover, Defendants have also extended a *de facto* individualized exemption to the Protests.  Any harm done by extending the same exemption to Plaintiffs in this case would be *de minimis*, particularly since hospitalizations

from COVID-19 have plummeted.  Thus, Defendants plainly cannot demonstrate that applying the current gathering limits to Plaintiffs, but not to analogous nonreligious conduct, furthers a compelling interest.  The Orders thus fail strict scrutiny.

## O.   The Orders are not Narrowly Tailored

Finally, the Orders fail because they are not narrowly tailored and do not leave open ample alternative channels for communication.  *See McCullen v. Coakley*, 573 U.S. 464, 477, (2014).  First, they are not narrowly tailored because they "burden substantially more speech than is necessary to further the government's legitimate interests." *Id*. at 486, *quoting Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).  Plaintiffs are willing to follow social distancing and hygiene requirements.  Yet the Orders forbid them from having more than 50 people in their church sanctuary.  Meanwhile, the Orders allow far greater in-person gatherings for all manner of other businesses and activities, including the Protests.  In other words, the government has shown it can accomplish its interest in more narrow ways than outright forbidding religious gatherings beyond these draconian limits as long as Plaintiffs ensure the maintenance of social distance and hygiene (which, ironically enough, Defendants have not fully required of the shoulder-to-shoulder Protests).  Plaintiffs are committed to following social distancing here, and thus the Orders are not narrowly tailored as to religious worship services.

Nor do the Orders leave open ample alternative channels of communication.  For Plaintiffs, drive-in and online services do not comply with the scriptural mandate to assemble together.  Instead, Plaintiffs' in-person, socially distant, hygienic worship-services are the only means to convey their religious message to their congregants.  Anything less is not adequate, let alone ample.

P.     **Plaintiffs Urge the Court to Follow** *Soos v. Cuomo*

On June 26, 2020 the United States District Court for the Northern District of New York

issued its decision in *Soos v. Cuomo*, 2020 WL 3488742 (N.D.N.Y. 2020).  In *Soos* the court

recognized the Supreme Court's recent decision in *South Bay*.  The Court stated, however, that

even *South Bay* recognizes that there are "'broad limits' that may not be eclipsed."  *Id*. *8.  The

Court found that those broad limits had been exceeded for precisely the same reason advanced

by Plaintiffs in this case – the State of New York allowed massive protests while clamping

down on religious gatherings.

The Court noted that while the New York orders did not specifically allow the protests,

"when the challenged law does not carve out an exemption on its face, the history of

enforcement is relevant to the existence of an exemption."  *Id*. *9.  The Court held that the *de

facto* exemption New York gave to the protesters demonstrated that its healthcare orders were

applied to give the protests preferential treatment and thus triggered strict scrutiny.  *Id*. *11.

The Court then held that the orders failed the strict scrutiny analysis and enjoined their

enforcement.  *Id*. *13.

In a passage that is particularly instructive, the Court wrote:

The City's argument that temporary selective enforcement of the challenged laws
with respect to mass race protests is a matter of public safety based on the
rationale of *Sisolak*, 2020 U.S. Dist. LEXIS 103234, would perhaps be legitimate
but for Mayor de Blasio's simultaneous pro-protest/anti-religious gathering
messages, which clearly undermine the legitimacy of the proffered reason for
what seems to be a clear exemption, no matter the reason.  **Governor Cuomo
and Mayor de Blasio could have just as easily discouraged protests, short of
condemning their message, in the name of public health and exercised
discretion to suspend enforcement for public safety reasons instead of
encouraging what they knew was a flagrant disregard of the outdoor limits
and social distancing rules**.  They could have also been silent.  **But by acting
as they did, Governor Cuomo and Mayor de Blasio sent a clear message that
mass protests are deserving of preferential treatment.**

*Id.* *12 (emphasis added).

The same applies in this case.  Governor Polis cannot reasonably argue that he did not stop the protests on public safety grounds.  Indeed, he sent troops to support the protests. Instead, he affirmatively encouraged flagrant disregard of the Orders, and sent a clear message that the Protests "are deserving of special treatment."

**Q.      Conclusion**

For the foregoing reasons, Plaintiffs respectfully urge the Court to grant their pending motion and enjoin the State from enforcing the Orders against gatherings for worship services.

Respectfully submitted this 30th day of June 2020.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
3801 East Florida Avenue
Suite 830
Denver, Colorado 80210
Voice:  (303) 205-7870
Fax:  (303) 463-0410
Email:  barry@arringtonpc.com
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2020, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email to the following parties of record:

Natalie Hanlon Leh
Eric R. Olson
W. Eric Kuhn
Emily B. Buckley
Ryan K. Lorch
Office of the Colorado Attorney General
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado  80203

*/s/ Barry K. Arrington*